IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

FILED BY _____ D.C.

05 AUG 17 PM 2: 51

THOMAS M. GOULD
CLERK, U.S. DISTRICT COURT
W/D OF TN, MEMPHIS

BETTY SMITH,               )
                           )
          Plaintiff,       )
                           )
v.                         )
                           )
JO ANNE B. BARNHART,       )     No. 04-2209 Ml/P
Commissioner of Social     )
Security,                  )
                           )
          Defendant.       )

---

### REPORT AND RECOMMENDATION

Plaintiff Betty Smith appeals from a decision of the Commissioner of Social Security ("Commissioner"), denying her application for disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq. The appeal was referred to the United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1). For the reasons below, it is recommended that the Commissioner's decision be affirmed, and Smith's appeal be denied.

### I.  PROPOSED FINDINGS OF FACT

A.  Procedural History

Smith filed her application for supplemental security income ("SSI") on June 26, 2001, alleging disability since April 17, 2001.

-1-

This document entered on the docket sheet in compliance
with Rule 58 and/or 79(a) FRCP on 8-17-05

20

Her application was denied initially and on reconsideration on September 27, 2001 and July 26, 2002, respectively. (R. at 28-31.) On August 8, 2002, Smith appealed that decision by requesting a hearing before an administrative law judge ("ALJ"). (R. at 44.) After the ALJ conducted a hearing on July 10, 2003 in Dyersburg, Tennessee, he issued a written ruling finding that Smith was not disabled as defined by the Social Security Act ("Act"). (R. at 15, 22.) Smith appealed the ALJ's decision, and on January 29, 2004, the Appeals Council of the Social Security Administration ("SSA") denied her request for review. (R. at 5-7.) The Appeals Council's decision effectively made the ALJ's decision the final decision of the Commissioner. Subsequently, Smith filed this timely appeal seeking judicial review of the Commissioner's decision.

B.   <u>Factual Background</u>

Smith was born on January 30, 1943, and attended school through the tenth grade. (R. at 371-72.) Her job history included working at a Tupperware factory in the 1970s, as a janitor at an elementary school for "a couple weeks" in 1997, and working for her daughter in 1999 and 2000 doing household chores. (R. at 139-40, 372). Apparently, Smith quit each job due to increased depression and nervous breakdowns. (R. at 139-40, 372, 380.) Smith claims she is eligible for SSI disability benefits based on her physical and mental impairments.

1.   <u>Physical Impairments</u>

-2-

The medical records indicate that Smith has had problems with her back, hips, legs, and feet. Prior to 1999, Smith saw Dr. Robert Harrington for routine gynecological exams and Dr. James Smith for high blood pressure and hypothyroidism. After Smith complained of leg and foot pains, Dr. Smith referred her to Dr. Keith Nord, an orthopedist who first examined Smith on April 2, 1999. At that examination, Smith complained of pain in her feet and left hip. She mentioned that she had bunions surgically removed from both feet, and that she fractured her left knee in 1991. Dr. Nord noted that her left straight leg raise was questionable, while her right straight leg test was negative.[1] X-rays taken of her lumbosacral spine were normal, and he recommended an electromyograph ("EMG") nerve conduction study. (R. at 177-78.) The EMG revealed normal nerve conduction, but the needle examination showed an equivocal abnormality in the L5 innervated peroneus longus and anterior tibialis of the left leg. This abnormality could suggest, but is not diagnostic of, a left L5 radiculopathy. (R. at 166.)

After reviewing the EMG report, Dr. Nord referred Smith for an MRI. The June 8, 1999 MRI revealed mild diffuse disc bulge and disc desiccation at L2/3 and small anterior osteophytes at L1/2 and L2/3. The remaining intervertebral disc showed normal contour and signal. (R. at 165.) Smith had a follow-up appointment with Dr.

---

[1]Positive straight leg tests indicate pain.

Nord on June 18, 1999. At that appointment, she demonstrated a full range of motion in her neck and back, and the straight-leg raise test was negative. Based on the EMG and MRI results, Dr. Nord diagnosed Smith with mild degenerative disc disease of the lumbosacral spine and L5 radiculopathy, and he noted problems with her left knee after its previous fracture and with her feet post bunionectomy. He recommended that Smith take Motrin for the pain and Flexeril, a muscle relaxant. (R. at 174.)

Dr. Nord next examined Smith on October 29, 1999. Smith complained of pain in her right knee and medial tenderness in her lower back and tenderness along her bunions. In addition to the previous diagnoses, Dr. Nord indicated that Smith had right knee chondromalacia. He again recommended Motrin for the pain. (R. at 173.) Smith presented similar complaints to Dr. Nord on February 18, 2000. At that examination, Dr. Nord noted a questionable straight leg raise, and made the same diagnosis as the October 29 diagnosis. He prescribed the muscle relaxant Parafon Forte. (R. at 172.)

On March 9, 2000, Smith saw Dr. Smith. Although the appointment was primarily for a mental examination, Dr. Smith noted the following:

> Patient complains of back pain but she is depressed w[ith] low self-esteem and absolutely is made very uncomfortable with back pain when in reality, her back problems are very little more than the usual changes that would be associated w[ith] degenerative back changes over a period of years.

-4-

(R. at 223.)

Smith's next follow-up visit with Dr. Nord occurred on April 28, 2000. At that time, she indicated that she had less pain in her legs. (R. at 171.) She saw him again on July 28, 2000. Although she complained of pain in her right groin, Smith indicated that her back pain was "not quite as bad as it was." Dr. Nord noted that she had a full range of motion in her hip and a negative straight leg test. His diagnosis was the same as those he made on previous occasions, except there was no mention of knee or feet problems. He recommended physical therapy and prescribed Naprosyn for pain. (R. at 170.)

On August 25, 2000, Dr. Nord examined Smith again. Smith complained she could not walk and she gets a "catch in the hip area." (R. at 169.) Dr. Nord observed that her back was still tender, but that she had minimal pain on internal and external hip rotation. He also scheduled her to have another MRI. (R. at 169.) The MRI showed no abnormalities. (R. at 164, 168.) At a September 1, 2000 follow-up visit, Smith indicated that her hip was feeling better. Dr. Nord noted that she had mild tenderness in her left hip and her right hip had a good range of motion. The doctor prescribed Parafon Forte and Motrin. (R. at 168.)

The record indicates that Smith did not see Dr. Nord again until January 12, 2001. At that time, she mentioned that she suffered from pain in the groin. Dr. Nord noted that she had a

-5-

full range of motion of her hips and the presence of lumbosacral degenerative disc disease. He prescribed Vioxx for pain. (R. at 167.) The record does not contain any other exams or notes by Dr. Nord.

Smith met with Dr. Smith on March 17, 2001, to check on her elevated blood pressure. She indicated that she still had aches in her legs, but that she was not taking the Vioxx because of its potential side effects. Dr. Smith informed her that she needed to take the medicine as prescribed. (R. at 219.) Dr. Smith's notes from exams on May 30 and June 22, 2001, make no reference to back, hip, or leg pain. (R. at 217.)

Although there are other medical notes from Dr. Smith in the record, the record indicates that Dr. Smith referred Smith to Dr. Ramaiah Indudhara for urinary complaints. Dr. Indudhara examined Smith on January 17, 2002, and diagnosed her with cystitis, urethral stenosis, and nocturia. (R. at 297.) He modified his diagnosis after an examination on April 16, 2002, to a voiding dysfunction, and referred her for an intravenous pyelogram (an x-ray of the urinary system). (R. at 296.) That study came back normal. (R. at 294.)

In addition to the reports of these treating physicians, the record includes two residual functional capacity assessments of Smith's physical abilities. On July 6, 2001, Reeta Misra, M.D., evaluated Smith, and concluded that she can occasionally lift up to

50 pounds, can frequently lift up to 25 pounds, can stand and/or walk 6 hours in an 8 hour workday, has no limitations in pushing and/or pulling, and can frequently climb, balance, stoop, kneel, crouch, and/or crawl. In reaching these conclusions, Dr. Misra listed arthritis as the primary diagnosis and noted Smith's medical background that included the diagnosis of a mild degenerative disc disease and groin pain. (R. at 277-84.)

A second physical residual functional capacity assessment was completed on July 25, 2002, by a medical consultant whose name only appears in the record in an illegible signature. Like Dr. Misra's evaluation, the second assessment indicates that Smith can occasionally lift up to 50 pounds, can frequently lift up to 25 pounds, can stand and/or walk 6 hours in an 8 hour workday, has no limitations in pushing and/or pulling, and can frequently climb, balance, stoop, kneel, crouch, and/or crawl. It also suggests that Smith should have readily accessible restroom facilities or use protected undergarments. The medical consultant indicated a primary diagnosis of degenerative disc disease with secondary diagnoses of a voiding dysfunction and rosacea. In addition, the consultant noted Smith's complaints of arthritis, joint pain, high blood pressure, groin pain, and hypothyroidism. (R. at 335-42.)

## 2. Mental Impairments

The earliest indications of mental impairments in the record come from a letter dated June 16, 1989, from Dr. Parks Walker. In

the letter, Dr. Walker stated that Smith had a severe depressive disorder for the past nine years and that she had not responded well to various forms of treatment. He also stated that "[d]ue to her illness and personality problems, it is difficult for her to conform her behavior in a socially acceptable way." (R. at 252.)

The next substantial medical examination in the record came from Pathways of Tennessee on October 18, 1999. At that time, Mary Helen Wood, Ph.D., diagnosed Smith as bipolar, and she assessed Smith's Global Assessment of Functioning ("GAF") at 65/70.[2]   No

---

[2] GAF ratings are subjective determinations based on a scale of 1 to 100 of "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual Mental of Mental Disorders (4th ed. 2000) at 32 ("DSM-IV Manual"). Each range can be described as follows: a GAF score in the range of 1-10 indicates "persistent danger of severely hurting self or others OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death;" a GAF score in the range of 11-20 indicates "some danger of hurting self or others OR occasionally fails to maintain minimal personal hygiene OR gross impairment in communication;" a GAF score in the range of 21-30 indicates "considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment OR inability to function in almost all areas;" a GAF score in the range 31-40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood;" a GAF score in the range of 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" a GAF score in the range of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers);" a GAF score in the range of 61-70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational or school functioning (e.g., occasional truancy or theft within the household), but generally

changes or significant comments were added to the Pathways report on Smith's December 6, 1999 visit, during which the physician assessed her GAF at 65/70.

During a progress visit at Pathways on February 21, 2000, Smith reported feeling depressed at times. She also requested a trial of Prozac. Apparently, Smith had taken Prozac in the past, and saw positive results. Dr. Wood added Prozac to her regimen and assessed her GAF at 70. (R. at 247.) Smith stopped taking Prozac before her next Pathways appointment on May 8, 2000, because she did not think it was working. Nevertheless, Dr. Wood apparently saw improvement in Smith's demeanor because she assigned a GAF rating of 80/85 on that day. (R. at 247.)

Smith's next appointment at Pathways was on July 25, 2000. She indicated that she had some highs and lows but felt stable overall. The physician assessed her GAF at 80/85. (R. at 245.) The same physician assigned Smith the same GAF rating at her next appointment on September 13, 2000. Despite this high subjective

---

functioning pretty well, has some meaningful interpersonal relationships;" a GAF score in the range of 71-80 indicates, "if symptoms are present, they are transient and an expectable reaction psychosocial stressors (e.g., difficulty concentrating after family argument; no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork));" a GAF score in the range of 81-90 indicates "absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns." Id. at 34 (some parentheticals omitted).

rating, the notes indicate that Smith was concerned with her daughter's decision to not let Smith continue to clean her (daughter's) house.  Smith informed the physician that she planned on applying for disability when she lost her job with her daughter, and she complained that she constantly was tired and had no energy. (R. at 243.)

On October 10, 2000, Smith again expressed concerns about losing her job with her daughter.  She mentioned to the Pathways physician that she often felt sad, and she believed that she felt better when taking Prozac.  The physician gave her a trial of Prozac.  (R. at 241.)  At her November 7, 2000 appointment, Smith indicated that she only took the Prozac for three or four days because it made her nervous and her chest hurt.  The physician noted Smith's mental status as stable, and added Zoloft to her regimen.  (R. at 240.) Smith stopped taking Zoloft after two days because it made her feel sick. (R. at 239.)

Progress notes from Pathways in March and April 2001 indicate that Smith expressed heightened irritability and concern that her family neglects her.  She also mentioned that she had thoughts of suicide, but she never acted on those thoughts.  (R. at 237, 238.) Progress notes from May 2001 indicate that Smith was admitted to Pathways for inpatient treatment for ten days.  Prior to being admitted, Smith expressed that she felt "more depressed all the time" and that she had daily crying spells.  (R. at 235.)  After

-10-

being discharged, Smith met with a Pathways physician on May 30, 2001, at which time she indicated that was feeling better. The physician noted that Smith was taking her prescriptions.

However, on June 2, 2001, a Pathways therapist indicated that Smith was no longer compliant with her medications. Smith said that the medications were killing her. Lisa Oliver, a licensed nurse at Pathways, assigned her a GAF rating of 55. (R. at 360.) Three days later, on June 5, 2001, Smith called Pathways seeking an increase in medication because she was not getting any better and she was having trouble sleeping. (R. at 233.)

Smith saw a physician on June 12, 2001, and complained again that "these meds are killing me." At that appointment, Smith indicated that she felt tired, weak, horrible, nervous, and depressed. The physician prescribed Paxil.

The next significant mental treatment for Smith occurred in October 2001, at which time she was admitted to Lakeside Behavioral Health System facility. Smith indicated she was experiencing increased depression, hopelessness, and suicidal ideation. She was admitted with a GAF rating of 10. (R. at 287.) During the hospitalization, she was prescribed different medications, many of which were discontinued or changed at Smith's request. (R. at 289.) Smith was discharged on October 16, 2001, after she was "pushing for discharge." The discharge summary states, "She still reported that she was not going to take any medications and denied any

-11-

suicidal ideation or thoughts." (R. at 290.) Smith was discharged with a GAF rating of 50 and was instructed to follow-up at Pathways. (R. at 287, 290.) On November 28, 2001, Smith met with a physician at Pathways, and indicated that she was suffering from anxiety, nervousness, and interrupted sleep. She denied, however, depression. (R. at 359.)

The subsequent progress notes from Pathways over the next six months suggest improvement in Smith's mental health. For example, on February 4, 2002, Smith reported that her mood was good and that she was taking her medications. (R. at 358.) On May 30, 2002, she said she was "doing pretty well, I guess," but she did complain of sexual side effects from Prozac. (R. at 357.) On June 5, 2002, Smith indicated she was doing well, and she was assigned a GAF rating of 75. (R. at 356.)

Between September and December 2002, staff members at Pathways assigned GAF ratings on three occasions ranging between 50 and 60. (R. at 351-52, 355.) During that time period, she requested and resumed taking Prozac, which she reported helped her. (R. at 352, 354.) In April 2003, she received GAF ratings between 40 and 50 on three occasions. (R. at 348-350.) Nevertheless, she indicated she was feeling better while on Prozac in May and June 2003. (R. at 346-47.) The final Pathways progress note in the record shows Smith receiving a GAF rating of 55 on June 27, 2003. (R. at 345.)

There are four assessments in the record of Smith's ability to

do work-related activities in light of her history of mental health.  On August 8, 2001, Jim Jackson, M.S., and Rebecca Sweeney, Ph.D., concluded that "Smith can travel independently.  Her memory is reduced and she has difficulty with concentration.  She appears to be able to relate effectively with others."  (R. at 256-59.)

Dan Emerson, M.S., evaluated Smith on June 27, 2002.  Emerson found no significant limitation in Smith's ability to understand, remember, concentrate, or adapt to changes in the work setting.  He found a moderate limitation on her ability to interact with others in light of her depression, anxiety, and panic attacks.  (R. at 316.)  Similarly, Dr. Kourany found that Smith had a moderate limitation on her social interaction skills during his July 19, 2002 evaluation.  Dr. Kourany also found Smith's restriction of daily living activities and difficulties in maintaining concentration, persistence, or pace to be moderately limited.  (R. at 328.)  Dr. Kourany concluded that Smith would be able to complete and sustain persistence on simple tasks and would be able to accept supportive criticism from supervisors, but that she would interact in a distant way with the public and would need assistance setting realistic goals. (R. at 334.)

The most recent assessment of Smith's mental ability to work was completed by Romona Scarborough, a nurse practitioner from Pathways.  Unlike the previous evaluators, Scarborough presented a somewhat negative outlook on Smith's ability to work.  She

indicated that Smith would be seriously limited or have no useful ability to function in understanding and memory, sustained concentration and persistence, social interaction, and adaptation. Scarborough concluded by stating,

> Although Betty is punctual and generally compliant with appointments/medication, she is limited in her capacity to handle [the] stress of therapy, immediate change, maintain motivation, and accept feedback without being depressed, overly conscious, and withdrawing socially. I do not believe she can fulfill job duties in a consistently responsible, dependable . . . manner.

(R. at 343-44.)  The assessment form states, in all capital letters, that "It is important that you relate particular medical findings to any assessed limitation in capacity; the usefulness of your assessment depends on the extent to which you do this."  Scarborough did not, however, identify the particular medical findings that support her assessment.

C.   Hearing Testimony

At the administrative hearing, Smith testified that she had back pain, but that it has gotten better. She also stated that her feet are uncomfortable due to bunions. She takes Tylenol to alleviate some of the pain because other medicines "don't agree" with her. (R. at 373.) Smith also testified that she wore a back brace while working for her daughter, but she did not find it necessary to wear it anymore because her back has gotten better. Regarding her mental health, Smith testified that she has had problems with depression for a long time. She briefly discussed

-14-

some of her treatment for depression. (R. at 374)

Smith also described her daily activities. She lives alone and is able to take care of herself. On a bad day, Smith sits and cries and watches televison. On a good day, she walks her dog multiple times a day and does light housework. (R. at 375.) Although Smith has a driver's license, she has not driven a car for six or seven months due to anxiety. (R. at 376.) When she goes to the store, she always goes with someone else. (R. at 386.)

Smith's ex-husband, James Smith,[3] also testified. They were married from 1959 until their divorce in 1996, but he sees her on a daily basis. He testified that Smith had depression during most of their marriage, and that the depression has gotten progressively worse. (R. at 393.) He also indicated that Smith does not like to be around others and even avoids holiday functions with family. (R. at 396.)

D.   The ALJ's Decision

Using the five-step disability analysis,[4] the ALJ found at the

---

[3]Smith's ex-husband is not the same as Dr. James Smith, the physician who monitored her high blood pressure and hypothyroidism.

[4] Entitlement to Social Security benefits is determined by a five-step sequential analysis set forth in the Social Security Regulations. 20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be engaged in substantial gainful activity for a period of not less than twelve months. 20 C.F.R. § 404.1520(c). Second, a finding must be made that the claimant suffers from a severe impairment. Id. Third, the ALJ determines whether the impairment meets or equals the severity criteria set forth in the Listing of Impairments contained in the Social Security Regulations. 20

first step in the analysis that Smith had not engaged in substantial gainful activity since her alleged disability onset date. At the second step, the ALJ determined that the medical evidence in the record establishes that Smith has mild degenerative disc disease of the lumbar spine and bipolar disorder, which produce more than a minimal effect on the ability to perform work activity. At the third step of the analysis, the ALJ found that Smith did not have an impairment or combination of impairments that would meet or equal the level of severity described for any listed impairment contained in 20 C.F.R. Part 404, Subpart P, Appendix 1 (R. at 16). The ALJ stated that the ultimate issue was whether Smith could perform her past relevant work, which in turn required an assessment of her residual functional capacity. Concerning Smith's physical limitations, the ALJ found that she could lift and carry 50 pounds occasionally and 25 pounds frequently, and stand, walk, or sit six hours in an eight hour workday. He based this finding on the state agency medical consultants' residual assessments. (R. at 20.) Concerning her mental limitations, the

---

C.F.R. §§ 404.1520(d), 404.1525, 404.1526. If the impairment satisfies the criteria for a listed impairment, the claimant is considered to be disabled. If the claimant's impairment does not meet or equal a listed impairment, the ALJ must undertake the fourth step in the analysis and determine whether the claimant has the residual functional capacity to return to any past relevant work. 20 C.F.R. § 404.1520(e). If the ALJ finds the claimant unable to perform past relevant work, then, at the fifth step, the ALJ must determine whether the claimant can perform other work which exists in significant numbers in the national economy. 20 C.F.R. § 404.1520(f).

ALJ found that Smith had a severe mental impairment, but that "she remains mentally capable of understanding, remembering, and carrying out simple instructions; making simple work-related decisions; interacting appropriately with supervisors and coworkers, although she should avoid work requiring interaction with the general public; and of performing unskilled, routine, repetitive work tasks, performed in relative isolation." (Id.)

In reaching this conclusion regarding Smith's mental condition, the ALJ discredited the assessment of Ramona Scarborough. He stated that her opinion was against the "consensus of the opinion evidence" and that the "assessment appears to be far too restrictive in light of the objective treatment records showing a GAF of 55 to 60 as recently as June 2003, the same month that the Medical Assessment form was completed." (R. at 20.) The ALJ also discredited Smith's testimony at the hearing because her subjective complaints and limitations were in conflict with the objective medical records. He also noted Smith's inconsistent statements regarding the usefulness of her medications. (R. at 19.)

Given these limitations, the ALJ concluded that Smith was capable of returning to her previous work as a day worker in domestic service. He stated that the "exertional and non-exertional requirements of that job as it is generally performed in the economy are consistent with the claimant's residual functional capacity within the meaning of the Act." (R. at 21.) Because he

-17-

found that Smith could perform previous work, the ALJ did not discuss the fifth step of the disability analysis.    20 C.F.R. § 404.1520

## II.  PROPOSED CONCLUSIONS OF LAW

Section 205(g), 42 U.S.C. § 405(g), of the Social Security Act provides for judicial review of a "final decision" of the Commissioner.    Section 1631(c)(3), 42 U.S.C. § 1383(c)(3), of the Act provides for judicial review to the same extent as the Commissioner's final determination under Section 205.

A court's review is limited to determining whether or not there is substantial evidence to support the Commissioner's decision, 42 U.S.C. § 405(g); Drummond v. Comm'r of Soc. Sec., 126 F.3d 837, 840 (6th Cir. 1997), and whether the correct legal standards were applied.  Landsaw v. Sec'y of Health & Human Servs., 803 F.2d 211, 213 (6th Cir. 1986).  When the record contains substantial evidence to support the Commissioner's decision, the decision must be affirmed.  Stanley v. Sec'y of Health & Human Servs., 39 F.3d 115, 117 (6th Cir. 1994) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson, 402 U.S. at 401 (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  In determining whether substantial evidence exists, the reviewing court must examine the evidence in the record taken as a

whole and must take into account whatever in the record fairly detracts from its weight. <u>Abbott v. Sullivan</u>, 905 F.2d 918, 923 (6th Cir. 1990). When substantial evidence supports the Commissioner's determination, it is conclusive, even if substantial evidence also supports the opposite conclusion. <u>Felisky v. Bowen</u>, 35 F.3d 1027, 1035 (6th Cir. 1994). Similarly, the court may not try the case <i>de novo</i>, resolve conflicts in the evidence, or decide questions of credibility. <u>Cutlip v. Sec'y of Health & Human Servs.</u>, 25 F.3d 284, 286 (6th Cir. 1994).

Smith contends that the ALJ's findings regarding her residual functional capacity and her past relevant work as a housekeeper are not supported by substantial evidence. She claims that the medical record does not support the ALJ's conclusion that she can perform a job that requires lifting 50 pounds occasionally and 25 pounds frequently and that her mental impairments do not seriously interfere with her ability to meet the demands of simple, repetitive work.

With respect to Smith's physical limitations, this court submits that substantial evidence in the record supports the ALJ's finding that she can lift 50 pounds occasionally and 25 pounds frequently, and stand, walk, or sit six hours in an eight hour workday. The two physical residual functional capacity assessments, both of which took into consideration Smith's degenerative disc disease and arthritis, directly support the ALJ's

conclusions. Indeed, there is nothing in the medical record that directly contradicts the ALJ's finding on this point. Moreover, Smith testified at the hearing that her back was well enough that she did not feel the need to wear a back brace.

Similarly, the court submits that there is substantial evidence in the record to support the ALJ's conclusion that Smith has the mental ability to meet the demands of simple, repetitive work in a relatively isolated environment. Although each state agency psychological consultant indicated some limitations in Smith's mental ability to work, none of them considered her limitations to be anything more than moderate. Additionally, the vast majority of times an examiner evaluated Smith and assigned her a GAF rating, the ratings were almost always between 55 to 85. Although Smith was rated at 10, 40, and 45 on three separate occasions, these GAF ratings were the rare exceptions. In any event, low GAF scores do not necessarily indicate problems related to a person's ability to work. See DSM-IV Manual, at 32-33 (indicating that a GAF rating can mean the symptom severity or the level of functioning); Zachary v. Barnhart, 94 Fed. Appx. 817, 819 (10th Cir. Apr. 14, 2004)(unpublished)(finding that a GAF score of 45 that does not have further explanation does not support a conclusion that impairment seriously interferes with a person's ability to work).

The court further submits that substantial evidence supports

-20-

the ALJ's decision to discredit Scarborough's evaluation, even if the court were to assume, *arguendo*, that Scarborough is a treating physician.[5]   As a general rule, "the medical opinion of a treating physician must be accorded greater weight than those of physicians employed by the government to defend against a disability claim." Hall v. Bowen, 837 F.2d 272, 276 (6th Cir. 1988)(citations omitted); see also 20 C.F.R. § 404.1527(d)(2). The opinion of a treating physician, however, is entitled to greater weight only if it is based on objective medical findings. Houston v. Sec'y of Health & Human Servs., 736 F.2d 365, 367 (6th Cir. 1984), and is not contradicted by substantial evidence to the contrary. Hardaway v. Sec'y of Health & Human Servs., 823 F.2d 922, 927 (6th Cir. 1987)(per curiam).   Thus, the Commissioner is not bound by the opinion of a treating physician when the opinion is contradicted by objective medical evidence. Cohen v. Sec'y of Health & Human

---

[5]It is unclear what role Scarborough played in the treatment of Smith.  It appears that Scarborough is somehow affiliated with Pathways, as her evaluation is found in the record in a group of materials from that institution.  The ALJ noted that she was a psychiatric nurse practitioner, and Smith indicates that Scarborough was the "treating source at Pathways."  (Smith's Brief in Support at 12.)  Nevertheless, the court has not found Scarborough's name on any other medical record, and therefore, it is unclear whether she participated in Smith's treatment or merely had access to her records at Pathways.  See 20 C.F.R. § 404.1502 (defining treating source as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you" and a nonexamining source as "a physician, psychologist, or other acceptable medical source who has not examined you but provides a medical or other opinion in your case.").

<u>Servs.</u>, 964 F.2d 524, 528 (6th Cir. 1992).

In <u>Martin v. Comm'r, Social Sec. Admin.</u>, 61 Fed.Appx. 191 (6th Cir. Apr. 9, 2003)(unpublished), the Court of Appeals for the Sixth Circuit considered and rejected the ALJ's reliance on plaintiff's GAF ratings (ranging from 58 to 70) and daily activity logs to contradict a treating physician's opinions.  The court stated that the treating physician presented a documented, reasoned narrative opinion that "specifically described conditions and effects which, if credited, demonstrate that [the plaintiff] suffers from a listed impairment under Listing 12.04 of 20 C.F.R., Part 404, Subpart P, Appendix 1."  <u>Id.</u> at 200.  The court also stated that "[i]t is clear that [the treating physician] based his opinion on a variety of factors, only one of which was the GAF scoring."  <u>Id.</u>  In the present case, however, Scarborough provided no bases whatsoever for her opinion - even though the assessment form instructed to do so.  Her one paragraph assessment does not describe in any detail the medical diagnoses or bases that support her assessment.  Moreover, as set forth in detail above, there is substantial evidence that contradicts Scarborough's assessment.

Smith's final argument is that the ALJ's finding that she had past relevant work as a housekeeper is not supported by substantial evidence.  Specifically, she argues that her job should not be considered relevant work because it was within the sheltered environment of her immediate family.  Regulations define past

relevant work as "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. § 404.1560(b)(1). "Substantial work activity is work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." Id. at § 404.1572(a). "Gainful work activity is work activity that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized." Id. at § 404.1572(b). The court submits that Smith's housekeeping duties for her daughter involved physical and/or mental duties for which she was earning a living, and therefore, her job meets these standards.

### III.   CONCLUSION

Accordingly, it is recommended that the court affirm the decision of the ALJ and deny Smith's appeal.

Respectfully submitted.

_____
TU M. PHAM
United States Magistrate Judge


_____
Date  August 17, 2005

-23-

## NOTICE

ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN TEN (10) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN TEN (10) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 20 in case 2:04-CV-02209 was distributed by fax, mail, or direct printing on August 17, 2005 to the parties listed.

---

Joe A. Dycus
U.S. ATTORNEY'S OFFICE
167 N. Main St.
Ste. 800
Memphis, TN 38103

Roger Stanfield
LAW OFFICE OF ROGER STANFIELD
P.O. Box 3338
Jackson, TN 38303--333

Honorable Jon McCalla
US DISTRICT COURT